886 F.2d 1545
 58 USLW 2242, 1989 Copr.L.Dec. P 26,475,
12 U.S.P.Q.2d 1412
 FRANK MUSIC CORP.; Robert Wright; George Forrest; Anne
Lederer as Executrix of the Last Will of Charles
Lederer; Luther Davis; Edwin Lester,
Plaintiffs-Appellants-Cross-Appellees,
v.
METRO-GOLDWYN-MAYER INC., et al.,
Defendants-Appellees-Cross-Appellants.
 Nos. 87-6257, 87-6321.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 4, 1989.
Decided Sept. 27, 1989.
 
 David H. Kornblum, Los Angeles, Cal., for plaintiffs-appellants-cross-appellees.
 Charles M. Stern, Wyman, Bautzer, Kuchel & Silbert, Los Angeles, Cal., for defendants-appellees-cross-appellants.
 Appeal from the United States District Court for the Central District of California.
 Before FLETCHER, BOOCHEVER and REINHARDT, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 In Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505 (9th Cir.1985) (Frank Music I ), we affirmed the district court's holding that defendants infringed plaintiffs' copyright in the dramatico-musical play Kismet, but remanded for reconsideration of the amount of profits attributable to the infringement and for consideration of whether defendants Donn Arden and Metro-Goldwyn-Mayer, Inc. (MGM, Inc.) should be liable in addition to MGM Grand Hotel, Inc. (MGM Grand). On remand, the district court awarded plaintiffs $343,724 against MGM Grand, dismissed the action against MGM, Inc. and Arden, and awarded plaintiffs $115,000 in attorney's fees. Plaintiffs appeal and defendants cross-appeal. We affirm in part, reverse in part, and remand.
 
 I. FACTS
 
 2
 The facts are fully set out in Frank Music I, 772 F.2d at 509-11. We reiterate only selectively. Plaintiffs are the copyright owners and authors of Kismet, a dramatico-musical work. MGM, Inc. under license produced a musical motion picture version of Kismet. Beginning April 26, 1974, MGM Grand presented a musical revue entitled Hallelujah Hollywood in the hotel's Ziegfeld Theatre. Hallelujah Hollywood was largely created by an employee of MGM Grand, Donn Arden,[1] who also staged, produced and directed the show. The show comprised ten acts, four billed as "tributes" to MGM motion pictures. Act IV was entitled "Kismet", and was a tribute to the MGM movie of that name. It was based almost entirely on music from Kismet, and used characters and settings from that musical. Act IV "Kismet" was performed approximately 1700 times, until July 16, 1976, when, under pressure resulting from this litigation, MGM Grand substituted a new Act IV.
 
 
 3
 Plaintiffs filed suit, alleging copyright infringement, unfair competition, and breach of contract. In Frank Music I, we affirmed the district court's conclusion that the use of Kismet in Hallelujah Hollywood was beyond the scope of MGM Grand's ASCAP license and infringed plaintiffs' copyright. In this appeal, the parties focus on the adequacy of damages and attorney's fees.
 
 II. DISCUSSION
 A. Apportionment of Profits
 1. Direct Profits
 
 4
 In Frank Music I, 772 F.2d at 514, we upheld the district court's conclusion that the plaintiffs failed to prove actual damages arising from the infringement, but vacated the district court's award of $22,000 in apportioned profits as "grossly inadequate," id. at 518, and remanded to the district court for reconsideration.
 
 
 5
 On remand, the district court calculated MGM Grand's net profit from Hallelujah Hollywood at $6,131,606, by deducting from its gross revenues the direct costs MGM Grand proved it had incurred. Neither party challenges this calculation.
 
 
 6
 In apportioning the profits between Act IV and the other acts in the show, the district court made the following finding:
 
 
 7
 Act IV of "Hallelujah Hollywood" was one of ten acts, approximately a ten minute segment of a 100 minute revue. On this basis, the Court concludes that ten percent of the profits of "Hallelujah Hollywood" are attributable to Act IV.
 
 
 8
 Memorandum of Decision and Order (Decision II ) at 4.
 
 
 9
 Plaintiffs assert that this finding is in error in several respects. First, they point out that on Saturdays Hallelujah Hollywood contained only eight acts, not ten, and that on Saturdays the show ran only 75 minutes, not 100. Frank Music I, 772 F.2d at 510. Second, Act IV was approximately eleven and a half minutes long, not ten. Id. Because the show was performed three times on Saturdays, and twice a night on the other evenings of the week, id., the district court substantially underestimated the running time of Act IV in relation to the rest of the show.[2]
 
 
 10
 If the district court relied exclusively on a quantitative comparison and failed to consider the relative quality or drawing power of the show's various component parts, it erred. See ABKCO Music, Inc. v. Harrisongs Music, Ltd., 508 F.Supp. 798, 800 (S.D.N.Y.1981), modified on other grounds, 722 F.2d 988 (2d Cir.1983); Lottie Joplin Thomas Trust v. Crown Publishers, 456 F.Supp. 531, 538 (S.D.N.Y.1977), aff'd, 592 F.2d 651 (2d Cir.1978). However, the district court's apportionment based on comparative durations would be appropriate if the district court implicitly concluded that all the acts of the show were of roughly equal value. Cf. Frank Music I, 772 F.2d at 518 ("Each element contributed significantly to the show's success, but no one element was the sole or overriding reason for that success.") While a more precise statement of the district court's reasons would have been desirable, we find support in the record for the conclusion that all the acts in the show were of substantially equal value.
 
 
 11
 The district court went on to apportion the parties' relative contributions to Act IV itself:
 
 
 12
 The infringing musical material was only one of several elements contributing to the segment. A portion of the profits attributable to Act IV must be allocated to other elements, including the creative talent of the producer and director, the talents of performers, composers, choreographers, costume designers and others who participated in creating Act IV, and the attraction of the unique Ziegfeld Theatre with its elaborate stage effects.... While no precise mathematical formula can be applied, the Court concludes that ... a fair approximation of the value of the infringing work to Act IV is twenty-five percent.
 
 
 13
 Decision II at 4-5.
 
 
 14
 The district court was correct in probing into the parties' relative contributions to Act IV. Where a defendant alters infringing material to suit its own unique purposes, those alterations and the creativity behind them should be taken into account in apportioning the profits of the infringing work. Cf. Sheldon v. Metro-Goldwyn Pictures Corp., 106 F.2d 45, 49-51 (2d Cir.1939), aff'd, 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825 (1940); see also Comment: An Improved Framework for Music Plagiarism Litigation, 76 Calif.L.Rev. 421, 454-55 (1988). However, the district court appears to have ignored its finding in its previous decision that defendants used not only the plaintiffs' music, but also their lyrics, characters, settings, and costume designs, recreating to a substantial extent the look and sound of the licensed movie version of Kismet. Memorandum of Decision and Order (Decision I ) at 10-11.
 
 
 15
 While it was not inappropriate to consider the creativity of producers, performers and others involved in staging and adapting excerpts from Kismet for use in Hallelujah Hollywood, the district court erred in weighing these contributions so heavily. In performing the apportionment, the benefit of the doubt must always be given to the plaintiff, not the defendant. Sheldon, 106 F.2d at 51. And while the apportionment may take into account the role of uncopyrightable elements of a work in generating that work's profits, see Sheldon, 106 F.2d at 50-51 (considering role of movie's actors, scenery, producers and directors); cf. McCulloch v. Albert E. Price, Inc., 823 F.2d 316, 320 (9th Cir.1987) (substantial similarity analysis can include examination of uncopyrightable elements), the apportionment should not place too high a value on the defendants' staging of the work, at the expense of undervaluing the plaintiffs' more substantive creative contributions. See Comment: An Improved Framework, supra, at 454-56. Production contributions involving expensive costumes and lavish sets will largely be taken into account when deducting the defendants' costs. Indeed, defendants concede that had they produced Kismet in toto, it would have been proper for the district court to award 100% of their profits, despite their own creative efforts in staging such a production.
 
 
 16
 The district court found that defendants' staging of the Kismet excerpts was highly significant to Act IV's success. While we believe that a defendant's efforts in staging an infringing production will generally not support more than a de minimis deduction from the plaintiff's share of the profits, we cannot say the district court's conclusion that the defendants' contributions were substantial in this case is clearly erroneous. We recognize that there will be shows in which the attraction of the costumes, scenery or performers outweighs the attraction of the music or dialogue. On the other hand, a producer's ability to stage a lavish presentation, or a performer's ability to fill a hall from the drawing power of her name alone, is not a license to use freely the copyrighted works of others.
 
 
 17
 We conclude that apportioning 75% of Act IV to the defendants grossly undervalues the importance of the plaintiffs' contributions. Act IV was essentially Kismet, with contributions by the defendants; it was not essentially a new work incidentally plagiarizing elements of Kismet. A fairer apportionment, giving due regard to the district court's findings, attributes 75% of Act IV to elements taken from the plaintiffs and 25% to the defendants' contributions.[3]
 
 2. Indirect Profits
 
 18
 In Frank Music I, we held that the plaintiffs were entitled to recover, in addition to direct profits, a proportion of ascertainable indirect profits from defendants' hotel and gaming operations attributable to the promotional value of Hallelujah Hollywood. The district court considered the relative contributions of Hallelujah Hollywood and other factors contributing to the hotel's profits, including the hotel's guest accommodations, restaurants, cocktail lounges, star entertainment in the "Celebrity" room, the movie theater, Jai Alai, the casino itself, convention and banquet facilities, tennis courts, swimming pools, gym and sauna, and also the role of advertising and general promotional activities in bringing customers to the hotel. The district court concluded that two percent of MGM Grand's indirect profit was attributable to Hallelujah Hollywood. In light of the general promotion and the wide variety of attractions available at MGM Grand, this conclusion is not clearly erroneous.[4]
 
 B. Prejudgment Interest
 
 19
 The district court, without comment, declined to award prejudgment interest. The availability of prejudgment interest under the Copyright Act of 1909 is an issue of first impression in this circuit.
 
 
 20
 The 1909 Act does not mention prejudgment interest. Nevertheless, courts may allow prejudgment interest even though the governing statute is silent. Rodgers v. United States, 332 U.S. 371, 373, 68 S.Ct. 5, 7, 92 L.Ed. 3 (1947). "[A] persuasive consideration ... is the relative equities between the beneficiaries of the obligation and those upon whom it has been imposed." Id. The goal of compensating the injured party fairly for the loss caused by the defendant's breach of the statutory obligation should be kept in mind. Id.; see also Loeffler v. Frank, 486 U.S. 549, 108 S.Ct. 1965, 1970-71, 100 L.Ed.2d 549 (1988). Prejudgment interest compensates the injured party for the loss of the use of money he would otherwise have had. General Motors Corp. v. Devex Corp., 461 U.S. 648, 655-56, 103 S.Ct. 2058, 2062-63, 76 L.Ed.2d 211 (1983); Handgards, Inc. v. Ethicon, Inc., 743 F.2d 1282, 1299-1300 (9th Cir.1984).
 
 
 21
 Defendants argue that Congress did not intend for prejudgment interest to be available under the 1909 Act. They ask us to infer this from the inclusion of prejudgment interest in the Patent Act, 35 U.S.C. Sec. 284 (1982),[5] and the omission of reference to prejudgment interest in either the 1909 Act or the Copyright Act of 1976. Because the Patent and Copyright Acts are similar statutes with similar purposes, defendants argue that differences between the two Acts with respect to prejudgment interest are intentional. Cf. Sony Corp. of America v. Universal City Studios, 464 U.S. 417, 435, 439, 104 S.Ct. 774, 787, 78 L.Ed.2d 574 (1984) (patent law appropriate source of guidance for novel copyright issues, but noting that doctrine of contributory infringement applies in copyright cases, where the statute is silent, as well as in patent cases, where the statute specifically refers to contributory infringers); Harris v. Emus Records Corp., 734 F.2d 1329, 1333 (9th Cir.1984).
 
 
 22
 Examination of the history of prejudgment interest in the patent context suggests this argument is flawed. Before Congress enacted 35 U.S.C. Sec. 284, prejudgment interest was generally available in patent infringement cases from the date damages were liquidated, and in exceptional cases from the date of infringement. See, e.g., Duplate Corp. v. Triplex Safety Glass Co., 298 U.S. 448, 459, 56 S.Ct. 792, 797, 80 L.Ed. 1274 (1936); Tilghman v. Proctor, 125 U.S. 136, 160, 8 S.Ct. 894, 906, 31 L.Ed. 664 (1888). Such a remedy was available despite the fact that the patent laws then in effect made no mention of prejudgment interest.[6] Indeed, the wording of the relevant patent statute was similar to that of Sec. 101(b) of the 1909 Copyright Act.[7]
 
 
 23
 Thus, interpreting the 1909 Act in light of patent law doctrine existing at the time of its enactment and during much of its effective period, we cannot conclude that Congress intended from its silence that prejudgment interest would not be available under the 1909 Act.[8] Just as courts awarded prejudgment interest in order to provide adequate compensation to patent holders before the enactment of 35 U.S.C. Sec. 284, this same remedy should be available to copyright owners for the same purpose. See also Fishman v. Estate of Wirtz, 807 F.2d 520, 584 (7th Cir.1986) ("The denial of prejudgment interest systematically undercompensates victims and underdeters putative offenders.") (Easterbrook, dissenting).
 
 
 24
 We therefore hold that prejudgment interest is an available remedy under the 1909 Act. Whether the circumstances of this case warrant the remedy is a separate question. The common-law rule during much of the effective period of the 1909 Act awarded prejudgment interest only on damages that were liquidated or readily ascertainable by mathematical computations and did not rely on opinion or discretion. See, e.g., General Motors, 461 U.S. at 651-52 & n. 5, 103 S.Ct. at 2060-61 & n. 2 (discussing history of common law rule). But even where damages were not liquidated or readily ascertainable, courts had the power to award prejudgment interest on unliquidated damages when necessary to compensate the plaintiff fairly. Miller v. Robertson, 266 U.S. 243, 258, 45 S.Ct. 73, 79, 69 L.Ed. 265 (1924).
 
 
 25
 Because the 1909 Act allows plaintiffs to recover only the greater of the defendant's profits or the plaintiff's actual damages, see Frank Music I, 772 F.2d at 512; Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp., 562 F.2d 1157, 1176 (9th Cir.1977), an award of profits or damages under the 1909 Act will not necessarily be adequate to compensate a prevailing copyright owner.[9] Accordingly, we conclude prejudgment interest ordinarily should be awarded.
 
 
 26
 Awarding prejudgment interest on the apportioned share of defendant's profits is consistent with the purposes underlying the profits remedy. Profits are awarded to the plaintiff not only to compensate for the plaintiff's injury, but also and primarily to prevent the defendant from being unjustly enriched by its infringing use of the plaintiff's property. See Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 399, 60 S.Ct. 681, 684, 84 L.Ed. 825 (1940); D. Dobbs, Handbook on the Law of Remedies 1 (1973). For the restitutionary purpose of this remedy to be served fully, the defendant generally should be required to turn over to the plaintiff not only the profits made from the use of his property, but also the interest on these profits, which can well exceed the profits themselves. See D. Dobbs, supra, at 169-70; Fishman, 807 F.2d at 583-84 (giving examples of the effect of compound interest to demonstrate how "the time value of money works in defendants' favor.") (Easterbrook, dissenting). Indeed, one way to view this interest is as another form of indirect profit accruing from the infringement, which should be turned over to the copyright owner along with other forms of indirect profit. It would be anomalous to hold that a plaintiff can recover, for example, profits derived from the promotional use of its copyrighted material, but not for the value of the use of the revenue generated by the infringement.[10]
 
 
 27
 We accordingly remand to the district court to enter an award of prejudgment interest.[11] The award should be based on the fifty-two week Treasury bill rate, unless the district court concludes that the equities demand a different rate. See In re Bloom, 875 F.2d 224, 228 (9th Cir.1989); Columbia Brick Works, Inc. v. Royal Ins. Co., 768 F.2d 1066, 1071 (9th Cir.1985).[12]
 
 
 28
 C. Liability of MGM, Inc.
 
 
 29
 In Frank Music I, we remanded to the district court to determine whether MGM, Inc., MGM Grand's parent corporation, should be liable for the infringement. We held that "[a] parent corporation cannot be held liable for the infringing actions of its subsidiary unless there is a substantial and continuing connection between the two with respect to the infringing acts." Frank Music I, 772 F.2d at 519-20.
 
 
 30
 The district court found that plaintiffs failed to establish such a substantial and continuing connection. According to the district court, the only evidence of a connection between MGM, Inc. and MGM Grand was MGM Grand's use of MGM Inc.'s studio facilities for planning the production prior to the opening of MGM Grand. The district court also noted, as a fact it believed favorable to MGM, Inc., that MGM Grand paid rent for the facilities and bore all the costs associated with the production of Hallelujah Hollywood.
 
 
 31
 The district court apparently did not consider several other important pieces of evidence. During the time of the infringing performances, MGM Grand was wholly owned by MGM, Inc. [R.T. 456] MGM, Inc.'s legal counsel responded to inquiries about the use of Kismet in Hallelujah Hollywood. [R.T. 488] Donn Arden's office was at MGM, Inc. [R.T. 209], and he was selected for the job with MGM Grand by a representative of MGM, Inc. [R.T. 217]. In addition to drawing patrons to the hotel and casino, Hallelujah Hollywood had another purpose: to promote MGM, Inc. and its "Leo the Lion" symbol. [R.T. 228, 242] Only material that had been used in MGM, Inc. films was used in the tribute segments of the show. [R.T. 359-60] Arden actively consulted with personnel from MGM, Inc. in preparing the show. [R.T. 232] MGM, Inc. made its movie version of Kismet available to Arden and Marvin Laird, who viewed it in a production room at MGM, Inc. [R.T. 243, 380] Arden and Laird got clearances for the material they wanted to use in Hallelujah Hollywood, including a clearance to use Kismet, from MGM, Inc. [R.T. 269, 271, 394] Laird, who worked on the music to Act IV, used material and was assisted by employees from MGM Inc.'s music library. [R.T. 301, 386]
 
 
 32
 The district court clearly erred in not finding that MGM, Inc. and MGM Grand had a substantial and continuing relationship with respect to the infringing activities. See Peter Pan Fabrics, Inc. v. Acadia Co., 173 F.Supp. 292, 298-99 (S.D.N.Y.1959) (substantial and continuing connection between defendant and company which actually sold infringing fabric where, inter alia, both had same president, defendant owned 70% of the seller's stock and defendant responded to notice of infringement). Therefore, we conclude that MGM, Inc. is jointly and severally liable for the judgment against MGM Grand.
 
 
 33
 Plaintiffs also argue that MGM, Inc. should be liable additionally for an award of its own profits or, in lieu of such an award, for statutory damages. We disagree. Our conclusion that MGM, Inc. had a substantial and continuing relationship with MGM Grand with respect to the infringement permits us to treat the two corporate entities as the same for purposes of imposing an award of profits. Nevertheless, the downstream corporate benefits to MGM, Inc. from the infringement are simply too attenuated and too speculative to support a further award from an apportionment of its corporate profits. The question of whether specific profits were made from an infringement is similar to that of proximate cause in the tort context: just as there comes a point beyond which effects cannot legally be attributed to an initial tortious action, so too there comes a point beyond which an infringer's profits, from its enterprises as a whole, cannot legally be attributed to a particular act of infringement. The profits of a hotel may well, as here, have a sufficient nexus with an infringing performance in the hotel's showroom to justify attributing some percentage of the hotel's profits to the infringement.[13] The profits of MGM, Inc. from its own interests and activities other than the MGM Grand lack such a nexus. Although MGM, Inc. may have reaped some marginal benefit from the infringement, for example from a slight increase in movie revenue as a result of the advertising value of the MGM Grand, or from a rise in stock value attributable in part to the success of the hotel, the percentage of such profits attributable to the infringing material in Act IV of Hallelujah Hollywood is too speculative and the relationship between such profits and the infringement too attenuated to justify the award of additional damages based on any profits received by MGM, Inc.
 
 
 34
 Plaintiffs argue that, if MGM, Inc.'s profits from the infringement are too speculative, MGM, Inc. must be liable for an award of statutory damages. See Frank Music I, 772 F.2d at 520; Russell v. Price, 612 F.2d 1123, 1130 (9th Cir.1979) (statutory damages mandatory if neither profits nor damages can be ascertained). This presents a question we declined to reach in Frank Music I: whether an award of statutory damages is mandatory against an infringer whose profits are not ascertainable when the profits of another infringer are ascertainable. See Frank Music I, 772 F.2d at 520 n. 12. Generally, if either profits or actual damages can be ascertained, an award of statutory damages is discretionary, although the latter type of damages should be awarded if profits or actual damages would be inadequate. Krofft, 562 F.2d at 1178.[14]
 
 
 35
 Statutory damages are available in order to effectuate two purposes underlying the remedial provisions of the Copyright Act: to provide adequate compensation to the copyright holder and to deter infringement. Frank Music I, 772 F.2d at 520; F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 232-33, 73 S.Ct. 222, 225, 97 L.Ed. 276 (1952). Where, as here, no actual damages have been proved and both defendants have been held jointly and severally liable for the profits earned by the primary infringer, we conclude the court should exercise its discretion to award statutory damages in lieu of profits only if they would exceed the profits for which the defendants are jointly liable. In that case, both the defendants should be held jointly and severally liable for the award of statutory damages. See MCA, Inc. v. Wilson, 677 F.2d 180, 187-88 (2d Cir.1981). Here we find the award of an aliquot share of MGM Grand's profits plus prejudgment interest adequately compensates plaintiffs for their injuries. Thus, statutory damages are not appropriate in the case of either defendant. The rule we follow serves the purpose of compensation because the plaintiffs are assured an adequate recovery, and it serves the purpose of deterrence because each defendant is jointly and severally liable for the award. An award of mandatory statutory damages against MGM, Inc. effectively would grant plaintiffs a windfall.[15]
 
 D. Liability of Donn Arden
 
 36
 In Frank Music I, we held that Donn Arden could not be held jointly and severally liable for MGM Grand's profits unless he acted as a partner or practically a partner of MGM Grand, rather than as an employee or independent contractor. 772 F.2d at 519. On remand the district court concluded that Arden was an employee of MGM Grand, and that his entire involvement with Hallelujah Hollywood fell within the course and scope of his employment. This finding was not clearly erroneous.
 
 
 37
 In Frank Music I, we opined that if the district court concluded that Arden was an employee, he nonetheless could be held severally liable for any profits he himself earned in connection with Hallelujah Hollywood. Id. Amounts paid to Arden in salary, however, were not to be considered as profits. Id. Although the district court on remand failed to make a factual finding as to whether Arden earned royalties or other profits from Hallelujah Hollywood, the record is clear that Arden received only a weekly salary, and did not receive royalties based on the revenues or profits from the show. See MCA, 677 F.2d at 186.
 
 
 38
 Plaintiffs argue that if Arden is not liable for an award of profits, he should be subject to an award of statutory damages. Although statutory damages may be awarded against a defendant who is not jointly liable with other defendants where there would otherwise be no award against that defendant, such an award is not mandatory. In this case it would be inappropriate, because the plaintiffs have been awarded ample compensation from MGM Grand and MGM, Inc., and deterrence would not be furthered by imposing statutory damages against Arden.
 
 
 39
 Arden consulted MGM, Inc. as to whether he could use material from Kismet. He was assured he could. There is no evidence Arden knew or should have known MGM, Inc.'s assurance was incorrect. Whether his use of this material was permissible depended on the content and interpretation of contracts and license agreements within the knowledge of MGM, Inc. and MGM Grand. The error of those defendants in concluding that MGM Grand's ASCAP license permitted the use they and Arden made of Kismet was not Arden's fault and Arden received no benefit from the infringement.[16] In these circumstances, no purpose would be served by sanctioning Arden by an award of statutory damages against him. Cf. Bradbury v. Columbia Broadcasting System, Inc., 287 F.2d 478, 485 (9th Cir.1961); compare Universal Pictures Co. v. Harold Lloyd Corp., 162 F.2d 354, 365 (9th Cir.1947) (greater blameworthiness where employee contributed material to infringing movie, knowing it to have been used previously in plaintiff's copyrighted movie).[17]
 
 E. Pendent Claims
 
 40
 In addition to their copyright claims, plaintiffs asserted pendent state law claims against MGM, Inc. for breach of contract and breach of the implied covenant of good faith and fair dealing. The district court, in its first decision, dismissed these claims based on its factual finding that MGM, Inc. had little or no involvement in the production of Hallelujah Hollywood. In Frank Music I, we considered plaintiffs' due process challenge to this dismissal.[18] We concluded that the district court did not err in dismissing the plaintiffs' contract claims. Frank Music I, 772 F.2d at 521. At the same time, we remanded to the district court to determine whether there was a substantial and continuing connection between MGM, Inc. and MGM Grand, as a component of the plaintiffs' copyright claims. Id. at 520.
 
 
 41
 Our determination that a substantial and continuing connection exists between MGM, Inc. and MGM Grand in regard to the copyright infringement requires us to conclude that the plaintiffs' pendent claims should not have been dismissed on the ground of a lack of such a relationship.[19] However, we nonetheless affirm the dismissal of the pendent claims. Any recovery available to plaintiffs under their contract and breach of implied covenant theories would either duplicate the profits awarded on their copyright infringement claim or, if based on actual damages, be precluded by our affirmance in Frank Music I of the district court's finding that plaintiffs failed to prove actual damages from the infringement. Frank Music I, 772 F.2d at 513.
 
 F. Attorney's Fees
 
 42
 Both parties appeal from the district court's award of attorney's fees to the plaintiffs. The plaintiffs argue that the district court awarded them too small a fee. The defendants argue that the plaintiffs are not entitled to a fee at all, and even if they are, the fee awarded was too high.
 
 
 43
 The decision to award fees, and the amount of fees awarded, are both reviewed for abuse of discretion.[20] Moore v. Jas. H. Matthews & Co., 682 F.2d 830, 838 (9th Cir.1982); Russell v. Price, 612 F.2d 1123, 1132 (9th Cir.1979). Plaintiffs in copyright actions may be awarded attorney's fees simply by virtue of prevailing in the action: no other precondition need be met, although the fee awarded must be reasonable. McCulloch v. Albert E. Price, Inc., 823 F.2d 316, 323 (9th Cir.1987) ("fees are generally awarded to a prevailing plaintiff"); Original Appalachian Artworks, Inc. v. Toy Loft, Inc., 684 F.2d 821, 832 (11th Cir.1982); cf. Russell, 612 F.2d at 1132. The district court correctly noted that such awards to prevailing plaintiffs serve the purpose of encouraging private enforcement and deterring infringements. The district court did not abuse its discretion in determining that the plaintiffs are entitled to an award of attorney's fees.
 
 
 44
 We conclude, however, that the district court erred in failing to explain the basis for the amount awarded. Plaintiffs' counsel did not provide the district court with contemporaneous time records. His "reconstructed records" claim 1707.5 hours spent on this case from 1975 through mid-May 1980. This reconstruction is memorialized in an itemized list. In addition, he estimated that he expended another 3500 hours on the case from mid-May 1980 to the summer of 1987, listing the services performed during that period but not allocating his time among the various services. Counsel sought compensation at the rate of $250 per hour. Counsel's only explanation for his failure to keep track of seven years of his work was that he "got out of the habit of keeping time on the case."
 
 
 45
 The district court found that counsel expended much unwarranted time--as much as 300 hours of work where only a single hour was necessary. The court found the facts simple, but noted that complicated legal issues relating to damages were presented. As additional reasons for reducing the amount of the fees award, the court remarked that plaintiffs prevailed on only one of three claims, and that "both sides engendered numerous delays and petty discovery disputes, resulting in the inordinate length of time necessary to resolve this case." The court, "[i]n view of all these factors," concluded that a reasonable attorney's fee was $115,000. The district court made no specific findings either as to the number of hours reasonably spent or what was a reasonable hourly rate.
 
 
 46
 The trial court correctly refused to accept uncritically plaintiffs' counsel's representations concerning the time expended. Sealy, Inc. v. Easy Living, Inc., 743 F.2d 1378, 1385 (9th Cir.1984). Plaintiffs bear the burden of showing the time spent and that it was reasonably necessary to the successful prosecution of their copyright claims. The lack of contemporaneous records does not justify an automatic reduction in the hours claimed, but such hours should be credited only if reasonable under the circumstances and supported by other evidence such as testimony or secondary documentation. Johnson v. University College, 706 F.2d 1205, 1207 (11th Cir.1983). Time spent by plaintiffs' counsel responding to motions or actions by the defendants should not be excluded from the fee award. "[A]lthough [defendants] had the right to play hardball in contesting [plaintiffs'] claims, it is also appropriate that [defendants] bear the cost of their obstructionist strategy." Burgess v. Premier Corp., 727 F.2d 826, 841 (9th Cir.1984). The district court blamed both sides for delays and petty discovery disputes, without differentiating those delays and disputes properly the fault of the plaintiffs from those properly the fault of the defendants. See Moore, 682 F.2d at 839 n. 10 (no reduction in fee where marginally useful work was necessary response to motions and defenses of the defendants).
 
 
 47
 In setting a reasonable attorney's fee, the district court should make specific findings of the rate and hours it has determined to be reasonable. Sealy, 743 F.2d at 1385. In Moore, the district court reduced counsels' fee request because, in the district court's opinion, they "were ... inclined to produce a large volume of less than useful material." 682 F.2d at 837 (ellipsis in original). We reversed and remanded that award, holding that the district court abused its discretion by reducing counsels' claimed hours by half and allowing less than half their normal billing rate solely on the ground that some of their work was less than useful. Id. at 839. Plaintiffs' counsel's inadequate showing has invited substantial discounting of his fee. Still, he is entitled to a reasonable amount. Before determining the appropriate fee, the district court should make a more detailed analysis of the time records presented and a finding as to the reasonable hourly rate. See Sealy, 743 F.2d at 1385. We accordingly remand to the district court to reconsider its award and to substantiate whatever fee it awards. In its discretion, it can require the parties to supplement the record.
 
 III. CONCLUSION
 
 48
 We vacate the damages award. We conclude that the proper apportionment entitles plaintiffs to 9% of the direct profits from Hallelujah Hollywood. We affirm the district court's finding as to the percentage of indirect profits attributable to Hallelujah Hollywood. We correct the award however for a mathematical error. Accordingly, plaintiffs are entitled to $551,844.54 as their share of direct profits and $699,963.10 as their share of indirect profits. We conclude that prejudgment interest should have been awarded, and remand for a calculation of the appropriate amount. We reverse the district court's finding that MGM, Inc. lacked a substantial and continuing connection with MGM Grand with respect to the infringement, and hold MGM, Inc. jointly and severally liable for the award of profits and prejudgment interest against MGM Grand. We affirm the district court's finding that Donn Arden is not jointly liable for the infringement, and decline to hold him severally liable for a separate award of profits or statutory damages. We affirm the district court's dismissal of plaintiffs' pendent claims. We vacate the award of attorney's fees so that the district court may make the necesary findings and recompute the amount to be awarded. We remand to the district court for further proceedings consistent with this opinion.
 
 
 49
 AFFIRMED in part, REVERSED in part, and REMANDED with directions.
 
 
 
 [1]
 The basis for finding Donn Arden to be an employee of MGM Grand is discussed infra
 
 
 [2]
 There were twelve shows weekly which ran for 100 minutes, plus three on Saturdays which ran 75, totalling 1425 minutes per week. Act IV remained constant throughout the week, for a total of approximately 173 minutes. Accordingly, Act IV comprised 12% of the total weekly running time of Hallelujah Hollywood. Because the district court's findings differ from those previously found and affirmed in Frank Music I, we substitute 12% as the appropriate figure on which we base our subsequent calculations
 
 
 [3]
 Based on this allocation, plaintiffs are entitled to $551,844.54 as direct profits from the infringement
 
 
 [4]
 We do, however, need to correct an error in calculation or typography noted by the plaintiffs. In subtracting MGM Grand's direct profits of $6,131,606 from its total net profit of approximately $395,000,000, the district court arrived at the figure of $380,868,394. The correct figure is $388,868,394. Plaintiffs are entitled to 9% (75% of 12%) of 2% of this figure, or $699,963.10
 
 
 [5]
 35 U.S.C. Sec. 284 provides:
 Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.
 This section has been interpreted to require that prejudgment interest "ordinarily be awarded where necessary to afford the plaintiff full compensation for the infringement." General Motors, 461 U.S. at 654, 103 S.Ct. at 2062.
 
 
 [6]
 Rev.Stat. Sec. 4921, as amended, 42 Stat. 392, 35 U.S.C. Sec. 70, provided in pertinent part:
 [T]he complainant shall be entitled to recover, in addition to the profits to be accounted for by the defendant, the damages the complainant has sustained thereby.
 
 
 [40]
 Stat. 704-05, 28 U.S.C. Sec. 1498 (1982), provides for a remedy in cases of patent or copyright infringement by the United States. Section 1498 allows the prevailing plaintiff "recovery of his reasonable and entire compensation," which the Supreme Court construed in Waite v. United States, 282 U.S. 508, 509, 51 S.Ct. 227, 75 L.Ed. 494 (1931), to include prejudgment interest on the profits the plaintiff would have made but for the infringement
 
 
 [7]
 17 U.S.C. Sec. 101(b) (1970) provides, in pertinent part:
 [The copyright proprietor shall be entitled to recover] such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement....
 
 
 [8]
 Nor do we suggest that Congress's continuing silence on this issue in the 1976 Act necessarily should be interpreted as an express disavowal of prejudgment interest. "Ordinarily, 'Congress' silence is just that--silence.' " Community for Creative Non-Violence v. Reid, --- U.S. ----, 109 S.Ct. 2166, 2177, 104 L.Ed.2d 811 (1989), quoting Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 686, 107 S.Ct. 1476, 1481, 94 L.Ed.2d 661 (1987)
 Only one circuit has considered the availability of prejudgment interest in a copyright infringement action, and that case construed the 1976 Act, not the 1909 Act. In Robert R. Jones Assocs. v. Nino Homes, 858 F.2d 274, 282 (6th Cir.1988), the Sixth Circuit vacated the district court's decision to award prejudgment interest under the 1976 Act. Finding that the district court's purpose in granting prejudgment interest was "to provide an effective sanction against copyright infringement," id., the court held that such a remedy was unnecessary to deter infringements in light of the availability under the 1976 Act of an award of profits and damages, as well as costs and attorneys' fees. Id.; see 17 U.S.C. Secs. 504(b), 505 (1982).
 The Sixth Circuit's decision is of limited utility in determining whether prejudgment interest should be allowed under the 1909 Act. Deterrence of infringement is not the only purpose of the copyright law: Congress also intended the damages provisions of the 1909 Act to provide adequate compensation to the copyright holder. F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 232-33, 73 S.Ct. 222, 225, 97 L.Ed. 276 (1952).
 The Second Circuit has affirmed an award under the 1909 Act which included prejudgment interest without discussing the issue. Lottie Joplin Thomas Trust v. Crown Publishers, 592 F.2d 651, 656 (2d Cir.1978). It does not appear that the propriety of that award was argued to the appellate court.
 
 
 [9]
 Prior to 1946, the patent law, like the 1976 Copyright Act, allowed recovery of both profits and damages. Rev.Stat. Sec. 4921, as amended, 42 Stat. 392, 35 U.S.C. Sec. 70; Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 505, 84 S.Ct. 1526, 1542, 12 L.Ed.2d 457 (1964). In 1946 Congress eliminated recovery of the patent infringer's profits, while at the same time making it easier for a patent holder to recover prejudgment interest, in order to ensure the patent holder full compensation. See H.R.Rep. No. 1587, 79th Cong., 2d Sess., 1-2 (1946); S.Rep. No. 1503, 79th Cong., 2d Sess., 2 (1946), U.S.Code Cong.Serv. 1946, p. 1386; 92 Cong.Rec. 9188 (1946); see also General Motors, 461 U.S. at 654-55, 103 S.Ct. at 2061-62. Although congressional intent in enacting the 1946 amendment to the patent law cannot shed light on congressional intent in enacting the 1909 Copyright Act, the provision of generally available prejudgment interest as a quid pro quo for the unavailability of profits in the patent context suggests the suitability of making prejudgment interest generally available under the 1909 Act where the copyright holder is limited to recovering only profits or damages, but not both. We do not, however, mean to suggest that this analogy should be dispositive in determining whether and when prejudgment interest should be awarded under the 1976 Copyright Act, issues on which we express no opinion
 
 
 [10]
 Prejudgment interest will, of course, be available on both the direct and indirect profits earned by MGM Grand, since both forms of profit are equally attributable to the infringement. Frank Music I, 772 F.2d at 517
 
 
 [11]
 Plaintiffs requested prejudgment interest only from the date of the last infringing performance. This is an acceptable date from which to start the running of interest. We need not decide in this case whether an award of prejudgment interest from some earlier point in time, such as the first infringement or date of notice, would be appropriate
 
 
 [12]
 This is the same rate on which postjudgment interest is based. See 28 U.S.C. Sec. 1961 (1982)
 
 
 [13]
 Thus, the result would be the same in this case even if the showroom where Hallelujah Hollywood was performed were a distinct corporate entity from the hotel as a whole, provided there was the requisite relationship between the two with respect to the infringement. See generally Shapiro, Bernstein & Co. v. H.L. Green Co., 316 F.2d 304, 307 (2d Cir.1963) ("When the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials--even in the absence of knowledge [of the infringement]--the purposes of copyright law may be best effectuated by the imposition of liability upon the beneficiary of that exploitation." [Citations omitted]. Similarly, had MGM, Inc. received a more definite, ascertainable financial benefit from the infringement, beyond the profits received by its hotel subsidiary, an award reaching those profits would be entirely proper. Joint liability for profits among interrelated corporate defendants serves the purpose of giving a successful copyright plaintiff its due reward without subjecting that award to the vagaries of corporate structures which, in the context of the particular infringement, should in fairness be ignored
 
 
 [14]
 If statutory damages are awarded, the amount must be in excess of the provable profits or actual damages. Krofft, 562 F.2d at 1178. This rule is a logical corollary of this circuit's rule that under the 1909 Act a plaintiff is limited to recovering only the greater of the infringer's profits or actual damages, but not both
 
 
 [15]
 Our rationale would not preclude an award of statutory damages against a defendant whose profits are not ascertainable and who is not jointly liable for an award of actual damages, statutory damages awarded in lieu of actual damages, or a co-defendant's profits. Because such a defendant has presumably received a benefit from the infringement distinct from that of its co-defendants, an award of statutory damages in lieu of profits would not necessarily give plaintiffs a windfall. At the same time, the absence of joint liability means that the severally liable defendant's conduct would not generally be deterred absent an award of damages
 
 
 [16]
 Because part of Arden's task was to create tributes to MGM movies, he acted well within the expectations of his employer in creating Act IV with heavy reliance on material from Kismet. His situation is thus different from that of a hypothetical employee who eases the demands of his job by plagiarizing the work of others, and therefore could be deemed to have received a benefit from the infringement even if his only financial benefit was in the form of salary
 
 
 [17]
 An award in the amount of profits actually earned by the employee would be appropriate in any event. Such profits, received through the use of the plaintiff's copyrighted material, should properly be turned over to the copyright owner
 
 
 [18]
 Although the district court had indicated at the outset of trial that it would not exercise pendent jurisdiction over these claims, it subsequently reversed course and permitted plaintiffs to make an evidentiary showing in respect to their pendent claims during the period of post-trial briefing. Plaintiffs did not make a proffer of additional evidence at that time
 
 
 [19]
 Defendants argue that the law of the case should preclude us from reexamining this question. Although issues previously decided by the same court in the same case will not ordinarily be subject to reexamination, considerations of fundamental fairness may in an appropriate case dictate an exception to this rule. Moore v. Jas. H. Matthews & Co., 682 F.2d 830, 833-34 (9th Cir.1982); White v. Murtha, 377 F.2d 428, 431-32 (5th Cir.1967)
 
 
 [20]
 17 U.S.C. Sec. 116 (1909 Act) provides: "the court may award to the prevailing party a reasonable attorney's fee as part of the costs." 17 U.S.C. Sec. 505 (1976 Act) provides for attorney's fees in virtually identical language